# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————————

Nº 15–CV–3508 (AMD) (RER)

————————————————

CSI ENTERTAINMENT, INC.,

Plaintiff,

VERSUS

ANTHEM MEDIA GROUP, INC., AND
FIGHT MEDIA, INC., D/B/A THE FIGHT NETWORK,

Defendants.

————————————————————

**REPORT & RECOMMENDATION**

December 30, 2016

————————————————————

**TO THE HONORABLE ANN M. DONNELLY,
UNITED STATES DISTRICT JUDGE**


**RAMON E. REYES, JR., U.S.M.J.:**


Plaintiff CSI Entertainment, Inc. ("CSI") commenced this action against Defendants Anthem Media Group, Inc. ("Anthem") and Fight Media, Inc. ("FM") (collectively "Defendants"), alleging that Defendants are infringing two of CSI's federally registered service marks: FIGHT SPORTS and FIGHT SPORTS NETWORK by using their FIGHT NETWORK mark in the United States. Defendants have been using their FIGHT NETWORK service mark in Canada since September 23, 2005 and recently entered an agreement with Cablevision to use the mark in the United States.

1

On June 15, 2015, under Federal Rule of Civil Procedure ("FRCP") 65, CSI moved for an order to show cause for a preliminary injunction, alleging that Defendants misappropriated CSI's marks by using FIGHT NETWORK on a competing television channel. (Dkt. No. 4, Order to Show Cause). CSI seeks a preliminary injunction to prohibit Defendants from expanding their use of FIGHT NETWORK in the U.S. during the pendency of this action. Your Honor referred CSI's application for a preliminary injunction to me for a report and recommendation. (Dkt. No. 25).

I held a preliminary injunction hearing (the "Hearing"), during which CSI called six witnesses: Steven Campione, CFO and COO of Rural Media Group; Jon Franklin, CEO of Glory Kickboxing; Craig Miele, Co-CEO of CSI; Richard Miele, Co-CEO of CSI; Kerry Davis, ex-Senior Vice President of HBO Sports; and Chris Tavlarides, owner of Sophia Entertainment. CSI's witnesses testified to the use of CSI's marks, CSI's business model, and CSI's reputation in the industry. Campione, Franklin, and Tavlarides also testified about the confusion that they believe arose between CSI's and Defendants' marks. (Tr. 21–549).

Defendants called four witnesses: Anthony Cicione, General Manager of operations at Anthem; Doug Jacobs, an expert in television programming distribution; James Genia, a journalist and author of books and publications in the combat sports industry; and David Rome, an intellectual property attorney. These witnesses testified about the generic nature of CSI's marks, CSI's use of its mark, the Defendants' presence in the U.S. market prior to Defendants' deal with Cablevision, and Defendants' reputation in the industry. (Tr. 550–880).

Based on the Hearing and for the reasons discussed herein, I respectfully recommend that CSI's request for a preliminary injunction against Defendants' use of FIGHT NETWORK be DENIED.

# I.  BACKGROUND

## A.  Parties

CSI is a multimedia company that distributes fight-related content globally through various media outlets and primarily functions as a "syndicated network."[1] (Dkt. No. 1, Complaint ("Compl."), ¶ 1). CSI has six trademarks registered with the United States Patent and Trademark Office ("USPTO" or "PTO"), two of which, FIGHT SPORTS and FIGHT SPORTS NETWORK, are at issue herein. (Compl.  ¶¶ 11, 12). Anthem and FM are Canadian companies with their principal place of business in Toronto, Canada. (Answer ¶¶ 96-97). They offer a "24/7 linear cable channel" to a variety of regional cable networks across the U.S. and have been using THE FIGHT NETWORK in commerce in Canada since September 23, 2005. (Tr. 638:23-25; Answer ¶ 104; Dkt. No. 19). When Anthem acquired THE FIGHT NETWORK in 2011, it changed the name to FIGHT NETWORK. (Tr. 571:9-12; Plaintiff's Reply Brief at 2).

## B.  Service Marks

CSI registered FIGHT SPORTS NETWORK with the USPTO on January 10, 2006. (Ex. 89B, F4). CSI registered FIGHT SPORTS with the USPTO on June 11, 2006. (Ex. J1).[2] At one point, Defendants applied to the USPTO to register their FIGHT NETWORK mark. The USPTO rejected the Defendants' trademark based on, among other things, its similarity to CSI's FIGHT SPORTS NETWORK mark. (Ex. 4; Compl. ¶ 25). On or about April 3, 2015, the USPTO deemed the FIGHT NETWORK application abandoned. (Ex. 10; Compl. ¶ 28).

---

[1] A syndicated network is one in which a party owns the rights to television content, but instead of airing that content on their own channel that can be accessed 24/7, the content is aired on specified time blocks on regional sports networks. For example, Madison Square Garden Network ("MSG") would agree to air CSI's programming from 8:00 pm – 10:00 pm and either pay CSI for airing its content or share in the advertsing revenue generated during that time block. (Tr. 222:19-25, 223:1-25, 224:1-5).

[2] Both these marks were registered for "[p]roduction of television programming in the field of contact sports; distribution of television programming in the field of contact sports to television systems; distribution of television programs for others" with respective claimed first use dates in September and May of 2004. (Ex. F1, F4, M1, M4).

### C.      Parties' Use of Marks

CSI, Anthem, and FM all broadcast fight-related content. CSI operates as a syndicated television network, whereas Defendants operate as a 24/7 linear channel in the U.S. (Tr. 81:20-22, 638:23-25). As a syndicated network, CSI can broadcast fights from fight promoters and enter into business arrangements with regional sports networks ("RSNs") that broadcast its content during designated time blocks. (Tr. 326:2-8).[3] Contrastingly, as operators of a 24/7 linear channel, Anthem and FM air constant content on their own network. (Tr. 638:23-25).[4]

### 1.   FIGHT SPORTS and FIGHT SPORTS NETWORK

In or around 2003, CSI began using FIGHT SPORTS and FIGHT SPORTS NETWORK to identify itself. (Tr. 79:12-17). As a syndicated network, CSI advertises to two distinct markets: the consuming public and RSN executives. (Tr. 78:11-21). CSI uses FIGHT SPORTS to market its product with the consuming public (*i.e.* the fan watching combat sports in his or her living room). (Tr. 205:9-21). Until this litigation, CSI used FIGHT SPORTS NETWORK only in business-to-business contexts as a way to identify its product to other television executives.[5] *Id.*

In using FIGHT SPORTS NETWORK in a business-to-business context, CSI would meet with RSN executives to sell them mixed martial arts and other fight-related content. (Tr. 326:2-

---

[3] The combat sports industry is a fragmented market, and without widely recognized leagues such as the NFL or NBA, viewers access combat sports-related content, such as live and recorded fights, through different promotors and content providers. (Tr. 73:4-25). CSI caters its services to this fragmented market. (Tr. 73:4-25). For example, it has compiled a library of fight-related content by purchasing broadcasting rights from content providers, such as Glory Kickboxing and HBO Boxing. (Tr. 54:16-22, 179:24-25; 180:1-7, 246:14-16). CSI packages and sells this content (under its brand) to RSNs, such as MSG, who air it on their network. (Tr. 190:4-18, 195:15-25).

[4] Because Defendants operate a 24/7 linear channel, when consumers browse through a television-programming guide, they see Defendants' content as available all day on that channel. (Tr. 561:11-25).

[5] After commencing this action, CSI began using FIGHT SPORTS NETWORK to identify itself to the general public through its deal with Verizon's Go90 service. (Tr. 490:18-25). Since this new use began in October 2015, four months after CSI initiated this action, the Court will disregard such use for the purpose of this report. (Def. FF ¶ 105).

8).[6] At meetings, CSI would provide executives with "sizzle reels," which displayed the FIGHT SPORTS NETWORK mark. (Tr. 30:13-24, 189:13-21, Ex. 10; Plaintiff's Proposed Finding of Fact ("Pl. FF"), ¶ 51). These reels had a sticker that read: "No Commercial Use." (Tr. 311:8-10).

In using FIGHT SPORTS in a business-to-consumer context, CSI places FIGHT SPORTS as an identifying "bug" on viewers' screens. (Tr. 86:6-14, 135:22-25, 136:1-6). Thus, when a RSN broadcasts CSI's content, it displays FIGHT SPORTS on the upper left-hand corner of the television screen. (Tr. 81:14-25, 82-83, 84:1-10, 85:6-25, 87:1-12; Ex. 13). Further, whenever CSI purchases a time-block from a RSN, viewers browsing a television programming guide see FIGHT SPORTS  displayed on the guide in addition to the bug on the program itself (Tr. 84:15-24, 85:21-25, 86:1-22).

In 2005, CSI's programming aired on tens of millions of homes. (Tr. 22:10-11). By 2011, its programming aired on 50 to 60 million homes. (Tr. 187: 14-22). As of the Hearing, CSI appeared on 17 RSNs, including MSG and Sun Sports. (Tr. 181:4-11).[7] Notably, since 2004, CSI has increasingly used FIGHT SPORTS NETWORK in agreements with various RSNs. (Tr. 205:9-21). Since this litigation, CSI entered an additional agreement to air fight-related content using the FIGHT SPORTS NETWORK mark on Verizon's Go90 mobile application. (Tr. 108:14-25, 109:1-19, 490:4-10).[8]

---

[6] In typical deals between CSI and a RSN, CSI would either sell the RSN the right to air its programming, or it would provide its programing to the RSN for free and the RSN and CSI would split any advertising revenue generated when CSI's programming aired. (Tr. 222:19–224:5).

[7] Through RSNs, CSI has broadcasted famous boxing matches involving boxers such as Floyd Mayweather, Oscar De La Hoya, and Miguel Cotto. (Tr. 96:18-25, 97:1-10). Although CSI considered launching a 24/7 linear television channel around 2005-2006, it instead decided to continue operating as a syndicated network. (Tr. 181:12-13, 187:8-12).

[8] The Verizon Go90 application is an over-the-top ("OTT") platform. The OTT market consists of platforms designed to give consumers content directly from a content provider without having to purchase a package through a MSO, such as Time Warner Cable or Cablevision. (Tr. 46:1-9).

## 2.  FIGHT NETWORK

Before entering the U.S. market as a 24/7 linear channel, Defendants operated primarily in Canada. (Answer ¶ 104; Dkt. No. 19). When CSI learned of Defendants' operations and use of the FIGHT NETWORK mark in Canada, by a letter dated March 21, 2007, CSI demanded that Defendants cease and desist from using the mark further. (Tr. 383:23-25, 384:1-3). On April 13, 2007, Defendants responded to the demand letter by denying that they infringed CSI's mark and claiming that CSI's marks were generic. (Ex. E). Defendants' letter also stated: "[u]nless I hear from you to the contrary, FN will consider this matter settled to CSI's satisfaction." (Ex. E). CSI did not respond to Defendants' letter, and Defendants continued to invest millions of dollars in establishing a presence in both the Canadian and U.S. markets. (Ciccione Aff. ¶¶ 7–15).

Around 2010, Anthem reorganized and acquired Fight Network. (Tr. 550:15-21). In 2013, Anthem also acquired Pursuit Channel, a hunting and fishing channel. (Tr. 554:7-19). On this channel, Anthem designated a two-hour block for FIGHT NETWORK PROGRAMMING. (Tr. 554:12-14). Around the same time, Anthem also purchased a channel called "My Combat," which broadcasted in Texas. (Tr. 555:10-13). Anthem continued running My Combat for about a year, and then decided to rebrand it as FIGHT NETWORK. (Tr. 555:13-16).

When Anthem subsequently learned that Cablevision had dropped a channel called FIGHT NOW, Anthem proposed that Cablevision replace FIGHT NOW with three of their channels, including FIGHT NETWORK. (Tr. 555:24-25, 556:1-11). The companies reached a deal, and in June 2014, FIGHT NETWORK became a 24/7 linear channel in the U.S. (Tr. 555:3-16, 598:12-25). Defendants claim to have also had a presence in the U.S. market prior to this deal. (Tr. 425:15-23, 428-430, 782:10-25, 783:1-6). They claim they had a U.S.-accessible website, where they sold Fight Network merchandise; a U.S.-accessible Facebook page, where they promoted their brand;

a YouTube channel, with over 40 million views, 14.2 million of which came from within the U.S.; and an editorial and video content partnership with Fox Sports online, all of which was established by 2010 when Anthem acquired Fight Network. (Tr. 551:22-25, 552-553).[9]

Defendants air approximately 300 hours of live programming annually. (Tr. 599:6-9). At the time of the Hearing, they had produced eight to nine original programs that were broadcasted in the U.S., Canada, and internationally. (Tr. 557:7-10). They have also aired unique programming, such as Ultimate Fighting Championship ("UFC") pregame shows, post weigh-ins, Home Box Office ("HBO") and Showtime pay-per-view boxing undercards, and live countdown shows. (Tr. 557:11-12). They additionally have a presence in the OTT market through platforms such as Roku, Klowd, and Amazon Fire. (Tr. 572:16-25).

CSI first learned of Defendants' entry in the U.S. market around June 2014, when Defendants launched their 24/7 linear channel. (Tr. 218:3-25, 219:1-5, 220:2-9, 446:6-19). At that time, learning that Defendants had filed a trademark application for FIGHT NETWORK, CSI began to monitor it. (Tr. 220-221, 448:18-25, 449:1-4). Shortly thereafter, the USPTO rejected the Defendants' trademark application, based in part on its similarity to CSI's registered mark. (Ex. 4). Eventually the USPTO deemed the Defendants' mark abandoned. (Ex. 10). While monitoring Defendants' USPTO application, CSI admitted that it did not believe Defendants would change their mark, even if their application was denied. (Tr. 224: 8-23). To enjoin Defendants from using the mark, CSI commenced this action. (Tr. 218:3-25, 219:1-5, 220:2-9, 224: 8-23; 446:6-19).

---

[9] To show their presence in the U.S. market before the launch of their linear channel in June 2014, Defendants point out that they had an exclusive news clip of Mike Tyson that was aired by CNN, ESPN, CBS, FOX, and TMZ (Tr. 553:8-25, 554:1). They also show that they signed UFC star Randy Couture on September 29, 2006 and Referee John McCarthy a year later, all well before June 2014. (Tr. 782:20-25, 783:1-6).

### D.      Instances of Confusion

When Defendants launched their 24/7 linear channel in the U.S., CSI received phone calls from industry insiders, congratulating it on launching a linear channel. (Tr. 60:8-21, 347:11-23). Jon Franklin, CEO of Glory Kickboxing, e-mailed CSI a congratulations, and CSI's CEO Richard Miele had to explain to Mr. Franklin that he was confusing CSI with Defendants. (Tr. 60:6-25, 61:1-4). Additionally, Chris Tavlarides, owner of the film and television production company, Sophia Entertainment, who had done prior business with CSI, received a Google alert that former boxer Ray Mancini had become a spokesperson for FIGHT NETWORK. (Tr. 347:11-23). Mr. Tavlarides had introduced Mancini to CSI, and thus, contacted CSI to inquire as to why he was not informed of the business arrangement between the two parties. (Tr. 346:25, 347:1-10, 355:2-9). Once again, CSI had to correct the confusion between CSI and the Defendants. (Tr. 348:5-14). Further, Steven Campione, CFO and COO of Rural Media Group, and former CSI employee from around 2010-2012, testified that he occasionally cleared up confusion between CSI and Defendants amongst distributors. (Tr. 23:7-12, 37:2-7).

## II.      DISCUSSION

Whether to grant or deny a preliminary injunction lies within the sound discretion of the district court. *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007). A party seeking a preliminary injunction must demonstrate (1) irreparable harm absent injunctive relief; (2) either (a) a likelihood of success on the merits, or (b) a serious question going to the merits to make fair grounds for a trial, with a balance of hardships tipping decidedly in its favor; and (3) that the public interest weighs in favor of granting an injunction. *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011). Because a preliminary injunction is an extraordinary remedy that should not be routinely granted, the party seeking it must demonstrate, by a clear

showing, that each element is satisfied. *Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865,

138 L.Ed.2d 162 (1997).

### A.     Irreparable Harm

### 1.     Legal Standards

"A showing of irreparable harm is the single most important prerequisite for the issuance

of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d

Cir.2009) (internal quotation marks and citations omitted). Irreparable harm comprises "the harm

that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication,

whether by damages or a permanent injunction." *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir.

2010). The Second Circuit has explained that "courts must not simply presume irreparable harm

... [instead, a plaintiff must show that] the failure to issue a[ ] [preliminary] injunction would

actually cause irreparable harm." *Id.* at 82 (citing *eBay, Inc. v. MercExchange, L.L.C.,* 547 U.S.

388, 393, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006)). Specifically, claims of irreparable harm

sufficient to support injunctive relief must be real, actual, and imminent, not remote or speculative.

*Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002); *See also Vox Amplification Ltd. v.

Meussdorffer*, No. CV 13-4922 ADS GRB, 2014 WL 558866, at *5 ("The court must not adopt a

'categorical' or 'general' rule or presume that the plaintiff will suffer irreparable harm … Instead

the court must actually consider the injury the plaintiff will suffer if he or she loses on the

preliminary injunction.") (quoting *Salinger*, 607 F.3d at 79-80).

In trademark cases,[10] irreparable harm exists "when the party seeking the injunction shows

---

[10] Although the *Salinger* court limited its holding to copyright cases, it noted that there was "no reason" that its injunction standard "would not apply with equal force to an injunction in any type of case." 607 F.3d at 78 n.7. The Second Circuit has yet to apply *Salinger* to trademark cases. But as most district courts in our Circuit have already done so, so too will this Court. *See Vox Amplification Ltd. v. Meussdorffer*, No. CV 13-4922 ADS GRB, 2014 WL 558866, at *5 (E.D.N.Y. Feb. 11, 2014); *Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 503 (S.D.N.Y.

that it will lose control over the reputation of its trademark pending trial. *Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.*, 95 (2d Cir. 1985) (citing 2 McCarthy, *Trademarks and Unfair Competition*, § 30.15 (2d ed. 1984)). This is because loss of control over reputation is neither easily calculable nor precisely compensable. *Vox*, 2014 WL 558866, at *4 (E.D.N.Y. Feb. 11, 2014) (citing *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F.Supp.2d 305, 343 (S.D.N.Y 2010)); *Marks Org., Inc., v. Joles*, 784 F.Supp.2d 322 (S.D.N.Y. 2011) ("Loss of good will is particularly hard to quantify because monetary damages do not 'redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come.' "). Rather, the harm caused by loss of control is "akin to tarnishment." *Christopher Norman Chocolates, Ltd. v. Schokinag Chocolates N. Am., Inc.*, 270 F. Supp. 2d 432, 435-36 (S.D.N.Y. 2003). It is especially likely when competitors sell "confusingly similar" products and one product is of "inferior or substandard" quality, thereby risking to cause the other immeasurable reputational harm due to customer "confusion as to source or sponsorship." *See id*.

Irreparable harm also exists when the party seeking the preliminary injunction shows that absent a preliminary injunction, its "trademark will cease to have utility as an informational device" and it will be unable to "preserve the mark's quality and its continued vitality." *See Church of Scientology Int'l v. The Elmira Mission of the Church of Scientology*, 794 F.2d 38, 43 (2d Cir. 1986) (citations omitted) (finding irreparable harm where consumers already had strong association with Plaintiff's mark and the Defendant's continued unauthorized use of the mark reduced the reputational value and goodwill of Plaintiff's mark). *See also CJ Products v. Snuggly*

---

2013); *Mrs. U.S. Nat. Pageant, Inc. v. Miss U.S. Org., LLC*, 875 F. Supp. 2d 211, 226 (W.D.N.Y. 2012); *CJ Prod. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 141 (E.D.N.Y. 2011); *Pretty Girl, Inc. v. Pretty Girl Fashions, Inc.*, 778 F.Supp.2d 261, 264–66 (E.D.N.Y.2011); *Grout Shield Distributors, LLC v. Elio E. Salvo, Inc.*, 824 F. Supp. 2d 389, 402 (E.D.N.Y. 2011); *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, No. 09 Civ. 9476, 800 F.Supp.2d 515, 539–40, 2011 WL 1842980, at *20 (S.D.N.Y. May 13, 2011).

*Plushez LLC*, 809 F. Supp. 2d 127, 145 (E.D.N.Y. 2011) (finding that Plaintiff established lost control over the reputation of its trademark, where it had consistently invested millions of dollars in advertising and promoting its product, and the competing product was so "extraordinarily similar," that it was confusing customers making online purchases).

Because an application for a preliminary injunction now requires a movant to make an actual showing of imminent irreparable injury in the absence of an injunction, delay is an important factor that the Court must consider. *See Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 457 (S.D.N.Y. 2014) ("It is well-established in this Circuit that delays in moving for injunctive relief to protect copyrights and trademarks from further unauthorized use weigh heavily against the movant") (citation omitted); *see also Marks v. Joles*, 784 F.Supp.2d at 332-34 ("courts have held that delay does not require denial of an injunctive relief if the likelihood of confusion is so great that it outweighs the effect of the Plaintiff's delay in bringing suit.") (citing *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic and Sports Physical Therapy*, P.C., 314 F.3d 62, 68 (2d Cir. 2002)). Courts must thus decide whether a party's delay was justified and caused by a good faith effort to investigate the facts and law as well as whether the likelihood of confusion to customers was so great that it would outweigh the effect of a plaintiff's delay in bringing suit. *Id*.

### 2.      CSI Has Failed to Establish Irreparable Harm

CSI has failed to establish that it will suffer irreparable harm absent an injunction for two separate and independent reasons.

First, CSI waited over one year after Defendants entered the U.S. market before filing suit and provided no justification such a long delay. Such an unjustifed delay severely undercuts any claim of irreparable harm. Courts generally excuse such delays only where Plaintiffs show that they were trying to resolve the issue. *See, e.g.*, *Tom Doherty Associates, Inc. v. Saban Entm't, Inc.*,

60 F.3d 27, 39 (2d Cir. 1995) (finding four-month delay reasonable as the plaintiff was attempting

to determine if there was actual infringement before filing suit); *King v. Innovation Books, a Div.*

*of Innovative Corp.,* 976 F.2d 824, 831 (2d Cir. 1992), (finding author's eight-month delay

reasonable where he spent that time trying to obtain a copy of the infringing screenplay and movie);

*Clifford Ross Co. Ltd. v. Nevlana Ltd.*, 710 F.Supp. 517, 521 (S.D.N.Y. 1989) (finding seven-

month delay reasonable where plaintiff was unaware of extent of the infringement and was actively

trying to resolve the dispute without litigation).

CSI argues that although it knew about Defendants' June 2014 agreement with Cablevision

to launch a linear channel in the U.S., (Tr. 218:3-25, 219:1-5, 220:2-9, 446:6-19), it waited until

June 2015 to file suit because it was monitoring Defendants' USPTO application for one year.

(Compl.; Tr. 555:3-16, 598:12-25; Pl. FF ¶¶ 76–82). Defendants, however, argue that "monitoring

the prosecution of an application is not justification to delay in taking prompt legal action to thwart

infringement" because the USPTO's determination of whether to register a mark is irrelevant to

the question of whether that mark is legally infringing an existing trademark through *use in*

*commerce*. (Dkt. No. 26, Defendants' Opp. Memo. at 8-9). Defendants also note that when CSI

first learned that Defendants might enter the U.S. market in 2007, CSI sent them a cease-and-desist

letter, warning not to use FIGHT NETWORK due to its substantial similarity to CSI's marks. (Dkt.

No. 69 Ex. D). Thus, they argue, CSI knew that Defendants were using a potentially infringing

mark years before this litigation commenced, and therefore, CSI's delay is unjustified. (Def. FF ¶¶

58, 79, 99-201).

Contrary to CSI's position, the Court finds that CSI's delay period with its wait-and-see

approach was not reasonable. The lengthy delay was not the result of a bona fide effort to resolve

the dispute without litigation. The evidence showed that even whilst Defendants' application was

pending, CSI's executives did not expect anything short of litigation to resolve the matter. (Tr. 224:8-25, 225:1-20, 555:3-16, 598:12-25). When CSI's CEO, Richard Miele, testified at the hearing, he admitted that even if the Defendants' application was rejected by the USPTO, he did not expect Defendants to change their mark: "Did I think that they were going to change their brand? If I had to guess what they'd do by abandoning their mark, no, I did not think that they would change their brand unless we did something…" (Tr. 224:17-23, 225:11-19).

Further, Mr. Miele testified not that he was trying to resolve the dispute without litigation, but rather, that he hoped that the parties would resolve the issues *after* CSI filed the suit. (Tr. 225:5-19). He even explained that the reason he did not believe Defendants would change their trademark absent litigation was because of their brand equity in the Canadian market. *See id*.

This Court also finds that although CSI commenced this lawsuit two weeks after the USPTO deemed Defendants' mark abandoned, (Tr. 449:2-4), CSI's had ample notice about Defendants' mark and growing presence in the U.S. market many years earlier. Not only did CSI send Defendants a cease-and-desist letter, warning them not to use FIGHT NETWORK due to its substantial similarity to CSI's marks in early 2007, but during the hearing, Richard Miele also testified that in October 2006—around the time that Fight Network hired famous martial arts fighter Randy Couture to be the company ambassador so that Fight Network could expand into the U.S. market—Miele met with Fight Network's then President Michael Garrow to discuss business plans. (Tr. 375-77).

In addition, the Second Circuit has explained that cases where a plaintiff's delay defeats a likelihood of irreparable injury are cases where the court had inferred "that the owner of the mark… had concluded that there was no infringement but later brought an action because of the strength of the commercial competition." *Marks v. Joles*, 784 F.Supp.2d at 334 (citing *.Tom*

*Doherty*, 60 F.3d at 39).

The Court finds that this is such a case. Although Fight Network had a minor presence in the U.S. prior to 2010 through Facebook, Youtube, and a partnership with Fox Sports Online (Tr. 551:22-25, 552-553), between 2013 and 2014, Fight Network entered deals with 13 separate MSO's in the U.S. and was expanding in the increasingly relevant OTT market (Tr. 45: 16-25, 46, 50). In June 2014, Fight Network entered a major five-year deal with Cablevision to have a full 24/7 linear channel broadcast throughout the U.S., the first of its kind. (Tr. 41: 16-18; 44: 15-21). While CSI had considered launching such a channel around 2005-2006, it was unable to solicit the right business deal and never realized the idea. (Tr. 77: 17-25, 78:1-7, 119). Thus, even though the Fight Network did not come into being or first enter the U.S. market in 2014, it was only then that CSI began to view Defendants as a serious competitor. Indeed, by CSI's own admission, the "specific event that happened that triggered the filing of this lawsuit" involved learning that "Defendants materials [were in] the offices of national pay TV operators." (Tr. 541-542:1-5).

The Court finds that CSI's delay was neither due to ignorance nor an active attempt to resolve the dispute and was more likely motivated by Defendants' sudden emergence as a viable commercial competitor. Accordingly, the Court finds CSI's delay unjustified.

Second, and more importantly, the evidence at the hearing fell far short of establishing that CSI has suffered or will suffer reputational harm without an injunction, CSI's conclusory speculation aside. *Alzheimer's Found. of Am., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc.*, No. 10 CIV. 3314 RWS, 2015 WL 4033019, at *11 (S.D.N.Y. June 29, 2015) ("conclusory statements of loss of reputation will not justify an irreparable harm finding") (citing *N.F.L. Players Ass'n v. N.F.L. Props., Inc.*, No. 90 Civ. 4244(MJL), 1331 WL 79325, at *4 (S.D.N.Y. May 7, 1991)).

Although in his affidavit, CEO Richard Miele claimed that CSI "will lose control over its reputation and will be harmed by Defendants' providing inferior services under a mark consumers will think is Plaintiff's," CSI never substantiated this conclusory belief with any demonstrative evidence of loss of sales, goodwill, or customer confusion. (Order to Show Cause at 12; Miele Aff., ¶¶ 22-47). CSI also never proved, as it needed to, that Defendants products were of similar but inferior quality, such that it would be highly likely that CSI would imminently suffer incalculable losses. *See Grout Shield Distributors, LLC v. Elio E. Salvo, Inc.*, 824 F. Supp. 2d 389, 402 (E.D.N.Y. 2011) (concluding that plaintiff failed to demonstrate irreparable harm where, by the hearing, plaintiff failed to show that defendant's product had affected plaintiff's sales).

As to the dearth of evidence that CSI had suffered any harm, before the hearing, CSI failed to produce profit or loss statements or business plans revealing any damages it suffered, despite Defendants strenuous requests. (Tr. 527:11-24, 612). At the hearing, when Co-CEO Richard Miele was asked: "Since the time of the filing of the complaint and today, up to today, what injury has CSI suffered?", he vaguely responded that he did not "think that [CSI's] injury is calculable." (Tr. 480: 17-25). When subsequently asked: "Have you lost any customers since the time of filing of the complaint until today?", he merely speculated: "It *could* be millions…I don't know how many. It *could* be millions." (Tr. 481: 3-6) (emphasis added). When the Court then asked whether in the year that Defendants had been operating their 24/7 linear channel, Miele had seen "any decline in any … indicators" or had "any evidence that any of those things have been affected; ratings … executives wanting to carry your content in their channel, any of those things?", he responded "I don't think so at the moment." (Tr. 482: 10-17). When the Court subsequently asked "What evidence, hard evidence, other than speculation [did he] have…," Miele's response and only proffered evidence was that "One of [CSI's] advisors saw [Defendants'] brochure on the desk or

in the offices of one of the leading satellite providers." (Tr. 483: 9-14).

The Court finds such testimony wholly speculative, unreliable, and wholly insufficient to establish irreparable harm. CSI provided no hard evidence at any point of the hearing as to damages, and CSI's only testimonial evidence was Miele's statement about what he believed another advisor saw, which is unreliable hearsay and insufficient to prove that CSI's sales have diminished, its reputation has been tarnished, or that it has suffered the loss of goodwill amongst any customers.

Evidence that customers had been confusing CSI and Defendants was also nonexistent at the Hearing. CSI's *only* evidence of confusion came from a few industry insiders. Jon Franklin, CEO of Glory Kickboxing, testified that he once mixed up the two companies when he read about Defendants' launch of their linear channel in a sports marketing journal. (Tr. 60:6-25, 61:1-4). Chris Tavlarides, owner of Sophia Entertainment, testified that he similarly once confused the two entities when he received a Google alert relaying that Defendants, not CSI, had reached a deal to work with former boxer Ray Mancini. (Tr. 347:11-23). And Steven Campione, CFO and COO of Rural Media Group, testified that when he had worked for CSI, he would occasionally clear up confusion between the two companies amongst investors and distributors. (Tr. 37:2-7).

The Court finds that not only was CSI's evidence of consumer confusion sparse, but none of it directly reflected confusion on the part of the general public. Although Franklin alluded that consumers occasionally wrote to him: "we have fans that reach out to us, and we point out, you know, Fight Network Canada, Fight Sports Network USA," no documentary evidence was provided to bolster this testimony. (Tr. 61: 10-12). When Co-CEO Richard Miele was asked if he ever received any emails reflecting consumer confusion, he replied "I don't recall any emails like that." (Tr. 530: 8-13). Moreover, CSI never provided the Court with any exhibits in the form of

likelihood of confusion surveys, statistics, or news clippings, indicating that there was any customer confusion. (Tr. 484: 6-23). Nor did any consumers directly testify as such.

Defendants, on the other hand, presented expert testimony from Doug Jacobs, a fight sports program distributor for 25 years, who testified that based on his experience in marketing to consumers who buy fight programming and the fact that CSI's product is a distinct "block that CSI provides to the various regional sports networks," as opposed to Defendants 24/7 linear channel, he did "not believe [consumers] would be confused at all." (Tr. 630-32, 654-55). He further elaborated: "we all have electronic programming guides. If you watch one hour of flight sports on the MSG Network and the Knicks games comes next, I guarantee you they realize they are watching the MSG Network." (Tr. 685:1-4). He believed the very nature of the two products was so distinct that he had "faith in the American public that when they turn on a TV channel and it says MSG Network on there they know what they are watching." (Tr. 684: 23-25).

The Court finds CSI's proof of customer confusion woefully deficient. Indeed CSI's own reliance in its briefs on *CJ Products v. Snuggly* underscores the need for more tangible proof than CSI provided. In *CJ Products*, the Court found irreparable harm where products were "extraordinarily similar in appearance" and the plaintiff "put forth evidence of confusion—for example, customer reviews from Amazon.com showing that at least some consumers purchased defendants' product believing them to be plaintiff's product." 809 F.Supp.2d at 145. Similarly, in *Marks v. Joles*, the Court found irreparable harm where Plaintiff proved with actual invoices that "Defendant's infringement of a store title has resulted … in a loss of good will" as "customers continue to be confused" about the true owner of the store. 784 F.Supp.2d at 335. Here, CSI provided no proof about customer confusion at all.

There was equally scant evidence that Defendants products are highly similar yet inferior

to CSI's. Before the hearing, when Defendants attempted to attain discovery to substantiate CSI's broad claim that FM's programming and production was of low quality, CSI provided no factual support for its conclusive allegations. For example, in its interrogatories, Defendants requested that CSI provide "specific facts that support its allegation that Fight Media's programming is inferior, namely why it is inferior, what makes it inferior, and what is the factual basis for those allegations." With no support, CSI gave the conclusory reply: "Pursuant to industry standards, the quality of the content that Defendants broadcast under their Fight Network brand, whether it be the production of the programming or the level of competition, is generally of a lower quality than what Plaintiffs air." (Serbagi. Affirm., Ex. 8 at 11).

At the Hearing, too, when asked about how Defendants programming was inferior to CSI's, CSI never provided the Court with *any* specific facts supporting that any consumers or distributors found Defendants products qualitatively inferior to theirs. Rather, CSI's witnesses focused on the fact that CSI had a very good reputation for providing a "large library" of "interesting pedigrees," namely high-level sporting events, in an otherwise highly fragmented combat sports market. (Tr. 22:10-19, 36:1-8, 38).[11]

Defendants, however, demonstrated to the Court that they produce quality programming. They showed that they had eight to nine original programs, "produced in-house in the studios or on site[s]" they ran, that were broadcasted in the U.S., Canada, and internationally. (Tr. 557:7-10). This included programming that was unique in the marketplace, such as: press conferences, UFC prefight shows, post weigh-ins, HBO and Showtime pay-per-view undercards, and live countdown

---

[11] The only testimony that CSI used to demonstrate Defendants' having an inferior product was through its first witness, Steven Campione. Campione testified that his company had decided not to enter an agreement with Defendants around 2009-2010 because, at that time Defendants company had been pitching for a while without success and had been in distress as well. (Tr. 39:15-25, 40:1-7). This fact however, does not speak to the quality of Defendants products *since* launching their linear channel in the U.S. Thus, the Court finds such testimony irrelevant.

shows. (Tr. 557:11-12). They also described how their programming was not limited to just live and recorded fights, like most of CSI's programs, but covered "fights, fighters, fight news, and fight lifestyle." (Tr. 558-559). They repeatedly emphasized that "quality is everything" and that "they had never had any complaints about the quality of their products." (Tr. 557-59). Defendants' evidence also revealed that even before the launch of their linear channel in June 2014, they aired exclusive clips of Mike Tyson on CNN, ESPN, CBS, FOX, and TMZ. (Tr. 553:8-25, 554:1). Defendants signed UFC star Randy Couture in September 2006 and Referee John McCarthy a year later. (Tr. 782:20-25, 783:1-6).  Defendants also signed a contract with Ronda Rousey, one of the premier and most popular fighters in the world. (Tr. 622-23).

This Court finds CSI and Defendants' products inherently different, rather than confusingly similar. CSI's CEO prides CSI for being "the only company in the world that sells just fight-related content." (Tr. 377:12-13). Defendants, however, boast having a broad, multi-platform channel that focuses on the four separate pillars of "fights, fighters, fight news, and fight lifestyle." (Tr. 558-559). Indeed, Defendants openly acknowledge that they often do not have the rights to broadcast the same live and recorded fights that CSI airs, but rather build unique programming around major live events in the combat sports world. (Tr. 584-85).

The Court also finds that the different nature of syndicated block programming compared to a 24/7 linear channel prevents two products from necessarily being in direct competition with one another. And having examined the sizzle reels of each network, the Court finds that both the marks employed and the programs shown are aesthetically distinct. As to the quality of Defendants' programming, the Court finds Defendants' recent expansion with MSO's and presence on OTT platforms, along with the fact that Cablevision has entered a five-year contract with Defendants, indicative that Defendants offer a quality program. *See Twentieth Century Fox*

*film Corp. v. Marvel Enters., Inc.*, 155 F.Supp.2d 1, 43 (S.D.N.Y. 2001) (finding no irreparable harm where although plaintiff claimed that a television series entitled "Mutant X" "dilute[d] the value of the 'X-Men' film franchise," "neither the nature nor quality of the alleged harm [was] precisely explained.").

*       *       *

Accordingly, having found no justifiable delay, no proof of consumer confusion, no evidence of loss of sales or goodwill, and no proof of Defendants having a confusingly similar yet inferior product, the Court finds that CSI has not met its burden in establishing irreparable harm.

### B.      Likelihood of Success on the Merits

Under § 1114 of the Lanham Act, a plaintiff in a trademark infringement action must show that defendant (1) without consent, (2) used in commerce, (3) a reproduction, copy or colorable imitation of plaintiff's registered mark, as part of the sale or distribution of goods or services, and (4) that such a use is likely to cause confusion. *See* 15 U.S.C. § 1114(1)(a); *Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing & Pub. Co. v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir. 1993). This means that plaintiff must show that: a) it has a valid mark entitled to protection and b) that defendant's use of it is likely to cause confusion. *Virgin Enterprises Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003).

### 1.      Entitlement to Protection

"The strength of a trademark in the marketplace and the degree of protection it is entitled to are categorized by the degree of the mark's distinctiveness in the following ascending order: generic, descriptive, suggestive, and arbitrary or fanciful." *Gruner*, 991 F.2d at 1075.

> A generic term is a common name, like automobile or aspirin that describes a kind of product. A common name, available to anyone, is never entitled to trademark protection. At the opposite end of the distinctiveness array is an arbitrary or fanciful term. Such may always claim trademark protection, is never a common

> name for a product, and bears little or no relationship to the kind of product represented. An arbitrary term is one that has a dictionary meaning—though not describing the product—like IVORY for soap. A fanciful mark is a name that is made-up to identify the trademark owner's product like EXXON for oil products and KODAK for photography products.

*Id*. A certificate of registration with the USPTO is prima facie evidence that the mark is protectable and that the registrant owns the mark and has the exclusive right to use it in commerce. *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999). Thus, the USPTO's registering a mark without proof of secondary meaning creates a rebuttable presumption that the mark is more than descriptive. *Id*. A defendant may, however, rebut this presumption by proving that the mark has become generic, *see Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194–95 (1985), or that it has not been used "in commerce." *See Buti v. Perosa, S.R.L.*, 139 F.3d 98, 102 (2d Cir. 1998).

In determining whether a mark is generic, the types of evidence Courts may consider include: "(1) generic use of the term by competitors which plaintiff has not challenged; (2) plaintiff's own generic use which may have an estoppel effect; (3) dictionary definitions…; (4) generic usage in trade journals or newspapers; (5) testimony of persons in the trade; and (6) consumer surveys." *Brandwynee v. Combe Int'l, Ltd.*, 74 F.Supp. 2d 364, 381 (S.D.N.Y. 1999).

The Lanham Act defines use of commerce as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. To satisfy use in commerce, the Act requires that: "(1) it is used or displayed in the sale or advertising of services and (2) the services are rendered in commerce...."15 U.S.C. §1127; *Aycock Engineering, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1357 (Fed. Cir. 2009). Mere advertising or promotion of a service is insufficient use in commerce. *Buti*, 139 F.3d at 105. Instead, the advertising or promotion must be accompanied by the "actual rendering …of the services in connection with which the mark is employed." *Id*. (quotations omitted). Further, the mark must be used deliberately and

continuously, not casually and sporadically. *La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271–72 (2d Cir. 1974). Thus, "[t]here must be a trade in the goods sold under the mark or at least an active and public attempt to establish such a trade." *Id.* at 1274. A registered mark that does not meet the use in commerce test is void *ab initio*. *Couture v. Playdom, Inc.*, 778 F.3d 1379, 1381 (Fed. Cir. 2015).

### a.   FIGHT SPORTS NETWORK

CSI argues that, as a federally registered mark, FIGHT SPORTS NETWORK is presumptively protected. Defendants argue that despite being registered, the mark is not protected because it has not been used "in commerce" under the Lanham Act. (Def. FF ¶ L). CSI, however, claims that FIGHT SPORTS NETWORK was used in commerce because not only was it affixed to the sizzle reels provided to television executives, but it was also used to generally identify CSI's products during negotiations with RSNs.[12] (Pl. FF. ¶¶ 51, 52; Tr. 189:13-21, 190:4-18, 195:16-25, 196-198, 199:1-2, 205:13-14; 222:19–224:5; Ex. 10, F2).

The Court finds that FIGHT SPORTS NETWORK has not been used in commerce under the Lanham Act. 15 U.S.C. § 1127. CSI admitted that sizzle reels were not intended for public distribution, and each reel even contained a disclaimer that stated: "No Commercial Use." (Tr. 311:8-10). Further, even if the mark was used during negotiations with RSNs, it was still not "used in a way sufficiently *public* to identify or distinguish the marked goods *in an appropriate segment of the public mind* as those of the adopter of the mark." *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F.Supp.2d 365, 371 (S.D.N.Y. 2007) (emphasis added).

As CSI has not shown that FIGHT SPORTS NETWORK was used in commerce, the Court

---

[12] "It is important to utilize the Fight Sports Network trademark on the outside of the DVD since it would get 'floated around the office to a couple of different executives' and the executives needed the ability to easily identify the reel as containing broadcast ready materials from the Fight Sports Network." (Pl. FF ¶ 54).

respectfully recommends that the mark is not entitled to protection under the Lanham Act.

### b.   FIGHT SPORTS

Defendants claim that FIGHT SPORTS is generic and therefore not entitled to protection; they further claim that it is synonymous with "Combat Sports," an umbrella term for mixed martial arts, boxing, and combative sports. (Tr. 752: 5–13).

To determine whether the mark is generic, courts consider six factors: "(1) generic use of the term by competitors which plaintiff has not challenged; (2) plaintiff's own generic use which may have an estoppel effect; (3) dictionary definitions…; (4) generic usage in trade journals or newspapers; (5) testimony of persons in the trade; and (6) consumer surveys." *Brandwynee*. 74 F.Supp. 2d at 381. Two of these factors, dictionary definitions and consumer surveys, have no bearing on the Court's analysis and favor neither party. The remaining four factors strongly support the Defendants.

### i.   Competitors' Generic Use That CSI Has Not Challenged

Defendants submitted numerous examples of "fight sports" being used on various combat sports websites, including two sites that used it for broadcasting combat sports. (Def. FF ¶ 30). When CSI was presented with such evidence, CEO Richard Miele testified that he believed at least one of these uses infringed CSI's trademark. (Tr. 364:20-25). Though it is unclear whether CSI knew that "fight sports" was used by other entities prior to this litigation, given Defendants substantial evidence of the term's widespread use in the industry, this factor favors the Defendants.

### ii.   Plaintiff's Generic Use of "Fight Sports"

CSI submitted numerous trademark applications to the USPTO in which it described its services as "related to fighting, contact sports, martial arts, and *fighting sports*." (Def. FF ¶ 36). Defendants noted that in at least four of CSI's specimens demonstrating the use of "fight sports,"

23

CSI used the term generically to describe its programming, including in reference to a competition called "Strike Force," that CSI claimed had "one of the highest Nielsen ratings in *fight sports*!" *Id.* ¶ 39 (emphasis added). In this Court too, CSI's counsel, repeatedly used "fight sports" to refer to CSI's general services. *Id.* ¶ 40. As CSI has used fight sports colloquially to describe a category of sport before the USPTO, this Court, and elsewhere, this factor favors Defendants.

### iii.     Generic Use In Trade Journals Or Newspapers

Defendants submitted ample evidence showing the generic use of "fight sports" in newspapers, such as the *New York Times*, *L.A. Times*, *Houston Chronicle*, and *Chicago Sun-Times*. (*See* Ex. DDD, HHH, JJJ, KKK). Defendants also admitted into evidence two books that used "fight sports" in their titles. (*See* Ex. HHHH, GGGG). Based on the evidence showing that "fight sports" is generically use by many publications, this factor also favors the Defendants.

### iv.     Testimony of Persons in the Trade

At the Hearing, much testimonial evidence showed "fight sports" to be synonymous with "combat sports." (Tr. 60:20-24; Def FF. ¶ 231). When Jon Franklin, CEO of Glory Kickboxing, was asked: "[w]hat are fight sports?" he answered, "[c]ombat sports." (Tr. 61:20-22). When asked if the two terms were synonymous, he replied: "[p]retty close I would say, yeah, for sure." (Tr. 61:23-24). James Genia, a journalist and author in the field of combat sports, also opined that fight sports is generic, that "fight sports" and "combat sports" are synonymous, and that they are used in the industry as an umbrella term for mixed-martial-arts, boxing, kickboxing, and other combative sports. (Tr. 752:11-18). Genia also explained how historically "fight sports" came to be used to describe a category of sports in the U.S. (Tr. 753-755). Given that few witnesses refuted that "fight sports" is generic, including CSI's witness, Jon Franklin, this factor favors Defendants.

Accordingly, this Court finds that the FIGHT SPORTS mark is generic, and it respectfully recommends that it not be afforded protection under the Lanham Act.

### 2.    Likelihood of Confusion

To determine the likelihood of confusion, this Court considers the eight factors set out in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961). These are: (1) the strength of plaintiff's mark; (2) degree of similarity between the marks; (3) proximity of the products (i.e., the extent that the parties compete with each other); (4) likelihood that plaintiff may "bridge the gap" into the market occupied by the defendant's product; (5) evidence of actual confusion; (6) evidence that defendant's mark was adopted in bad faith; (7) respective qualities of the products; and (8) sophistication of the relevant consumer group. *Id*. at 495; *Natural Organics, Inc. v. Nutraceutical Corp.*, 426 F.3d 576, 578 (2d Cir. 2005). "[E]valuation of the *Polaroid* factors is not a mechanical process 'where the party with the greatest number of factors weighing in its favor wins.' " *Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 584 (2d Cir. 1993) (citing *Physicians Formula Cosmetics, Inc. v. W. Cabot Cosmetics, Inc.*, 857 F.2d 80, 85 (2d Cir. 1988)). No factor is dispositive; and courts should focus on whether consumers are likely to be confused. *Id.* (citing *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 580 (2d Cir. 1991)). Because CSI asserts that both FIGHT SPORTS NETWORK and FIGHT SPORTS were infringed, the court will discuss how each *Polaroid* factor applies to each mark.

### a.    Strength of the Mark

There are two relevant concepts in assessing the strength of a mark: its "inherent distinctiveness" and its "acquired distinctiveness." *Virgin Enterprises*, 335 F.3d at 147. To assess "inherent distinctiveness," courts place the mark in one of four categories: (1) arbitrary or fanciful; (2) suggestive; (3) descriptive; and (4) generic. *Abercrombie & Fitch Co. v. Hunting World, Inc.*,

537 F.2d 4, 9 (2d Cir. 1976). Arbitrary and fanciful marks are the most protected marks because consumers would likely be confused if such marks were placed on different products. 335 F.3d at 147-48. Marks that merely describe goods are entitled to less or no protection because granting exclusive use would prevent others from describing similar products with general descriptions. *Id*. "Acquired distinctiveness," namely fame or consumer recognition, is also concerned with consumer confusion. When a mark is inherently distinctive and has also acquired distinctiveness, courts tend to find a greater likelihood of consumer confusion. *Id*.

Here, with regard to the inherent distinctiveness of FIGHT SPORTS NETWORK, the Court finds that this mark is not arbitrary or fanciful, as it merely describes the product, which is a syndicated television network showing fight sports content, and it appears in block text in different colors, with no particularly unique design or symbol. (*See* Exs. N2, RRRRRR).



The mark's acquired distinctiveness is less clear. Because CSI used this mark in negotiating with industry insiders, (Pl. FF. ¶¶ 51, 52), the Court assesses their perception of the mark and likelihood of confusion. CSI provided evidence that some industry insiders had favorable opinions of CSI's service and had at times confused the two companies. (Tr. 55:16-21, 246:10-25, 247:1-4, 5-9). For example, Jon Franklin, CEO of Glory Kickboxing testified that he confused CSI and Defendants. (Tr. 61:9-12). Kerry Davis, an executive at HBO Sports, testified that he associated CSI with Fight Sports Network when he watched an event, although notably, he also testified that he could not actually identify FIGHT SPORTS NETWORK. (Tr. 253:6-14, 258:2-8, 259:9-25, 260:1-7, 265:3-

7). Apart from this sparse and mixed testimony, these insiders represent a small fraction of the total consumer group, and the Court cannot impute their testimony on the entire consumer group absent additional evidence. Moreover, even if their testimony sufficiently indicated that the mark acquired distinctiveness, it cannot outweigh the descriptive nature of the mark. *Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.*, 478 F.Supp.2d 340, 343 (E.D.N.Y. 2007) ("[D]escriptive marks are eligible for protection only when they have acquired distinctiveness or 'secondary meaning.'") (citing *Bristol-Meyers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1039 (2d Cir. 1992)). Accordingly, this factor for this mark favors Defendants.

As to FIGHT SPORTS, given that the Court already finds this mark generic, it also finds that this mark is not inherently distinct. Regarding its acquired distinctiveness, although CSI displayed FIGHT SPORTS as its "bug" on programming that aired in 70 million homes, (Pl. FF ¶ 70), neither party submitted any consumer surveys revealing consumers' perceptions of the mark. (*See* Tr. 670:6-13). Thus, this Court has no evidentiary basis to find that the consuming public recognizes the mark. Thus, this factor for this mark also favors Defendants.

### b.    Degree of Similarity Between the Marks

To assess similarity, "…courts look to the overall impression created by the logos and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." *Gruner*, 991 F.2d at 1078.

Turning first to the similarity between FIGHT SPORTS NETWORK and FIGHT NETWORK. Since CSI used FIGHT SPORTS NETWORK in dealing with television executives and fight distributors, the Court again analyzes potential confusion within this context. CSI provided evidence that the similar wording of the marks occasionally confused television executives and content distributors, since the only difference in wording is the word "sports" in

27

CSI's mark. (Tr. 60:8-21, 348:5-14). For example, Steven Campione, a prior CSI employee, stated that investors and distributors would confuse CSI and Defendants' separate entities as the same company. (Tr. 37:2-7). But the evidence also showed that while the marks have similar wording, they have distinct designs. (*See E*x.'s N2, RRRRRR, 95).

 

The Court finds that it is unlikely one could confuse the distinct appearances of the marks. As such, this factor favors neither party.

As to the similarity between FIGHT SPORTS and FIGHT NETWORK, since CSI used this mark to cater its services to the public, the Court analyzes confusion in this context. As with the marks above, the Court finds that these marks are similarly worded, though these marks only share the word "fight" in common as opposed to "fight" and "network." Like the marks above, the Court finds that these marks do not look that similar to one another. (*See* Ex. M4, RRRRRR, 95).

 

Thus, these marks are unlikely to confuse the consuming public into believing that the two entities provide the same programming. Accordingly, this factor favors Defendants.

### c.  Proximity of Products

For this factor, courts assess the degree to which two products compete with one another,

the idea being that if owners of similar marks operate in separate spheres of commerce, consumers are less likely to think that the marks originate from the same source. *Virgin*, 335 F.3d at 149-50.

Turning first to FIGHT SPORTS NETWORK. Again, as a syndicated network, CSI only uses this mark as a promotional tool for RSNs. Defendants, however, operate as a 24/7 linear channel and air their own content. Therefore, Defendants do not promote or advertise their products to RSNs. In that sense, CSI's FIGHT SPORTS NETWORK and Defendants' FIGHT NETWORK are not in direct competition with regards to the general consuming public. (Tr. 189:13-21, 638:23-25; Ex. 10.). These marks are in direct competition, however, when CFI and Defendants are *purchasing* content from distributors. (Tr. 54:18-22, 58:5-10).

John Franklin, CEO of Glory Kickboxing, testified that he does business with CSI by selling it fight-related content, and that he has also sold rights to his fight-related content to the Defendants to air in Canada. (Tr. 58:5-23). Thus, despite the parties' different business models, both depend on buying fight-related content from similar providers. The Court finds that both parties' purchasing content from the same content providers is sufficient to show that FIGHT SPORTS NETWORK and FIGHT NETWORK are proximately related. (Tr. 54:18-22, 58:5-10).

As to the proximity of CSI's FIGHT SPORTS and Defendants' FIGHT NETWORK marks, these marks are used in some of the same spheres of commerce within the U.S. For example, both companies use these marks when airing fight-related content on websites. (Tr. 425:15-23, 428-430, 782:10-25, 783:1-6; PL. FF ¶ 31). Because the marks are used in a similar manner for similar products in the same sphere of commerce, the Court finds that these marks are also proximately related products. Accordingly, for both marks, this factor favors CSI.

**d.      Likelihood that Plaintiff will "Bridge the Gap"**

"Bridging the gap" is a term that describes "the senior user's interest in preserving avenues

of expansion and entering into related fields." *Juicy Couture,* 930 F. Supp. 2d at 501 (citing *New York City Triathlon,* 704 F.Supp.2d at 338; *CLASS Promotions Inc. v. DS Magazines, Inc.*, 753 F.2d 14, 18 (2d Cir. 1985)). To assess this factor, courts consider the likelihood or the perception that a Plaintiff will enter the Defendants' market. *Star Industries, Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 387 (2d Cir. 2005). Where two parties already offer similar products that directly compete with one another, however, the Second Circuit has held that "the 'bridging the gap' factor is irrelevant." *Vox*, 2014 WL 558866, at * 12 (citing *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.,* 588 F.3d 97, 115 (2d Cir.2009)). Thus, in *Vox*, even though the Court found that at a certain "level of abstraction," the products did not directly compete with another, the parties' products and markets were generally close enough where there was "not much of a gap to bridge." *Id*.

Such is the case here. Although CSI uses FIGHT SPORTS and FIGHT SPORTS NETWORK differently within its business model, both marks proximately relate to Defendants' mark in some market. (As previously discussed, FIGHT SPORTS NETWORK and FIGHT NETWORK compete with one another for buyers; FIGHT SPORTS and FIGHT NETWORK compete with one another for general consumers). Because each of CSI's marks is in some direct competition with Defendants' mark, and CSI makes no argument that is trying to expand into Defendants' markets, such as by beginning a 24/7 linear channel, this factor favors neither party.

### e.     Actual Consumer Confusion

Under the Lanham Act, actual confusion means "consumer confusion that enables a seller to pass off his goods as the goods of another." *Lang v. Retirement Living Pub. Co., Inc.*, 949 F.2d at 582. To show actual confusion, a Plaintiff must show that the Defendants' use "could inflict commercial injury in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation." *Id*. at 583.

CSI provided evidence of three industry insiders who either personally experienced confusion or allayed confusion between CSI and Defendants. (Tr. 37:2-7, 60:8-21, 348:5-14). The first was Steven Campione, who testified that when he worked for CSI, a few potential investors mistakenly believed that CSI's FIGHT SPORTS NETWORK was actually Defendants' FIGHT NETWORK. (Tr. 37:2-7). The second was Jon Franklin, CEO of Glory Kickboxing, who testified that when Defendants launched their linear channel in the U.S., he thought CSI launched it and mistakenly called CSI CEO Richard Miele to congratulate him. (Tr. 60:8-21). Franklin also alluded that he had to clear up the confusion for fans who reached out to him. (Tr. 61:9-12). The third industry insider was Chris Tavlarides, who once produced a documentary on Ray Mancini and had introduced Mr. Mancini to Miele. (Tr. 345:23-24, 347:2-7). When Tavlarides received a Google Alert about a business deal between Mr. Mancini and Defendants, he reached out to Miele to inquire why he was not informed about it. (Tr. 347-348).

Defendants argue that these instances are not legally cognizable because no purchasing decision was being made when they occurred. (Def. FF ¶ 291). Thus, they argue that while some confusion may have existed, it was irrelevant. Indeed in *Lang v. Retirement Living Pub.*, the Second Circuit explained that "the relevant confusion is that which affects 'the purchasing and selling of the goods or services in question.'" 949 F.2d at 582 (citing *Programmed Tax Systems, Inc. v. Raytheon Co.*, 439 F.Supp. 1128, 1132 (S.D.N.Y. 1977). It further noted, "trademark infringement protects only against mistaken purchasing decisions and not against confusion generally." *Id.* (citing *Restatement (Third) of Unfair Competition* § 20 reporter's note at 179).

The Court agrees that trademark law is concerned with confusion of customers or potential customers as they are making purchasing decisions; therefore, none of the evidence of confusion the CSI presented was sufficient. Campione never provided any details or proof regarding which

investors seemed confused or what, if any, consequences resulted from his clarifying which company was which. Similarly, neither Franklin nor Tavlarides are direct consumers of CSI's product who were confused while making purchasing decisions about CSI's programming. Franklin is a content distributor already in a business relationship with CSI, and the extent of Tavlarides' business relationship with CSI was his introducing Mancini to CSI. Nothing indicated that Tavlarides' network has purchased fighting content from CSI or otherwise consumed CSI's product. (Tr. 52:16-25, 53:1-5, 54:16-22, 346:9-20). Further, although the testimony given by Franklin implied that perhaps certain fans had confused the parties' marks, the testimony is uncorroborated hearsay and is afforded little weight by the Court. In addition, there have been no surveys conducted by either side to reflect actual consumer confusion, nor has any consumer testified about actual confusion. (Tr. 670:6-13). On such scant proof, the Court cannot conclude that actual confusion exists between these marks. Therefore, this factor favors Defendants.

### f.    Evidence that Mark was Adopted in Bad Faith

CSI presented no evidence showing that Defendants used FIGHT NETWORK in bad faith. In a March 2007 letter, CSI did demand that Defendants cease and desist from using FIGHT NETWORK further. (Tr. 383:23-25, 384:1-3). But when Defendants responded to the letter, stating: "[u]nless I hear from you to the contrary, FN will consider this matter settled to CSI's satisfaction," (Ex. E), CSI did not respond, and Defendants continued to invest millions of dollars in developing a presence in the U.S. market. (Ciccione Aff. ¶¶ 7–15). This evidence, far from demonstrating Defendants' bad faith, suggests that CSI may have acted in bad faith by not responding to its own letter and waiting several years to file a lawsuit, while Defendants extensively developed their business. Accordingly, this factor favors neither party.

### g.     Respective Qualities of the Products

Although CSI argues that its product is superior, after reviewing the testimonial and documentary evidence, including the sizzle reels that each party submitted, the Court does not find either party's product superior. As such, this factor favors neither party. *See* Section I.A.2., *supra*.

### h.     Sophistication of Relevant Consumer Group

"The final *Polaroid* factor is grounded on the belief that unsophisticated consumers aggravate the likelihood of confusion." *Juicy Couture,* 930 F. Supp. 2d at 502 (quoting *Simon & Schuster, Inc. v. Dove Audio, Inc.*, 970 F. Supp. 279, 300 (S.D.N.Y. 1997). Thus, when assessing likelihood of confusion, Courts typically consider "the general impression of the ordinary consumer, buying under normal market conditions and giving the attention such purchasers usually give in purchasing the product at issue." *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d at 746. (2d Cir. 1998). Yet, courts recognize that not all consumers are equal; retail consumers do not exercise the same degree of care as professional buyers, who discriminate more and are less easily confused. *Virgin*, 335 F.3d at 151 ("Where the purchasers of a products are highly trained professionals, they know the market and are less likely than untrained consumers to be misled or confused by the similarity of different marks."). To determine if a consumer group is sophisticated, courts typically look at whether the consumer group would have to decide to pay for a product and whether a product is expensive. *See, e.g.*, *Gross v. Bare Escentuals Beauty, Inc.*, 641 F.Supp.2d 175, 192 (S.D.N.Y.2008) ("The greater the value of an article the more careful the typical consumer can be expected to be ...").

As to FIGHT SPORTS NETWORK, because CSI mainly used this mark on sizzle reels to sell its product to RSN executives, the relevant consumers are such executives. As RSN executives are professional buyers who decide whether or not to purchase CSI's programs, the Court finds

that they are more sophisticated than average consumers and therefore less likely to be confused about the source or sponsorship of products. *C.f. Bristol–Myers Squibb*, 973 F.2d at 1046 (explaining that average consumers are those who typically make "low involvement" purchases of fairly inexpensive products). This *Polaroid* factor thus favors Defendants.

For FIGHT SPORTS, the relevant consumer group is the general consuming public. Although on cross-examination, Doug Jacobs, Defendants' expert in television programming and distribution, argued that a combat sports-watching fan is a "sophisticated purchaser," (Tr. 696:18-22), when asked why, he merely offered that people who watch combat sports pay for fight-related content when it airs on pay-per-view. (Tr. 699:7-15).

Here, the Court disagrees with the Defendants' reasoning. CSI operates as a syndicated network, not a pay-per-view program. As a syndicated network, CSI's product is free for consumers with a cable subscription that carries a RSN airing CSI's programming. Thus, most consumers do not make an elaborate decision to purchase CSI's program that would qualify them as sophisticated purchasers. Rather, they impulsively decide whether or not to tune into CSI's programming. As such, they are just as likely as average persons to be confused by similar products.  Therefore, this factor favors CSI.

*     *     *

Having assessed all the *Polaroid* factors with regards to FIGH SPORTS NETWORK, the Court finds that the balance of these factors favors Defendants. Again, the Court notes that no one factor is dispositive and a party does not prevail solely on the basis of having a majority of factors in its favor; rather, the inquiry hinges mostly on whether consumers are likely to be confused. *Paddington*, 996 F.2d at 584. Here, not only did a greater number of the factors favor Defendants, but more importantly, because the mark is descriptive and the consumers that CSI used this product with were sophisticated industry insiders, their likelihood of confusion was

34

low, notwithstanding the few industry experts who testified about a few isolated incidents. The Court thus finds that the *Polaroid* factors disfavor injunctive relief.

Similarly, having reviewed all the factors for CSI's FIGHT SPORTS mark, the Court finds that they again strongly favor the Defendants. Not only does the Court deem FIGHT SPORTS to be merely descriptive and dissimilar in design to Defendants' FIGHT NETWORK mark, but CSI also presented no evidence to the Court about actual consumer confusion. On balance, there is also not a sufficient basis for the Court to infer a high likelihood of consumer confusion.  Thus, the *Polaroid* factors for this mark also disfavor injunctive relief.

### C.    Public Interest

Having concluded that all relevant factors disfavor injunctive relief for both marks, the Court's sole remaining task is to confirm that denying injunctive relief would not disserve the public interest. *N.Y. City Triathlon*, 704 F. Supp. 2d at 344. The consuming public has a protectable interest in being free from confusion and in being assured that the mark it associates with a service is not attached to services of unknown origin and quality. *Id.*; *Vox*, 2014 WL 558866 at *15.

In this case, there is little risk that the consuming public would likely be confused or deceived by Defendants use of FIGHT NETWORK because regardless of whether CSI's marks are entitled to protection, though this Court believes they are not, the Defendants mark is not confusingly similar to CSI's marks. *See Christopher Norman Chocolates*, 270 F. Supp. 2d 433, 435. Accordingly, the Court respectfully finds that the public interest is not disserved in denying CSI an injunction.[13]

---

[13] Because I recommend that a preliminary injunction be denied, I will not render a recommendation on Defendant's defense of unclean hands with respect to the FIGHT SPORTS NETWORK mark. (Def. FF ¶ D). Were I required to make such a recommendation, however, I would recommend against sustaining the defense.  CSI has indeed

Because CSI has not demonstrated irreparable harm, a likelihood of success on the merits, or that public policy favors equitable relief for either mark, this Court respectfully recommends denying CSI's request for a preliminary injunction.

## CONCLUSION

For the reasons discussed, I respectfully recommend that CSI's request for a preliminary injunction against Defendants' use of FIGHT NETWORK be DENIED. Any objections to the recommendations made in this Report must be filed with the Clerk of the Court and the Honorable Ann M. Donnelly within fourteen (14) days of receipt hereof. Failure to file timely objections waives the right to appeal the District Courts Order. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72; *Small v. Secretary of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).

SO ORDERED.

*Ramon E. Reyes Jr.*
RAMON E. REYES, JR.
United States Magistrate Judge

Dated:  December 30, 2016
        Brooklyn, NY

---

consistently claimed that its use of FIGHT SPORTS NETWORK on sizzle reels constituted use in commerce. (Pl. FF ¶¶ 52, 54). As Defendants have the burden of proof, they must show that CSI made this assertion in bad faith. There is no such evidence to support that CSI lied about using FIGHT SPORTS NETWORK in commerce. While CSI may have thought that its use of the mark satisfied the Lanham Act's use in commerce requirement, that thought alone is insufficient to establish willfulness.  Defendants have not come forth with any evidence of willfulness, and therefore their defense must be rejected.